IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBERT GROVE STONE and
GARY RALPH STONE,

    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.

NO. C06-0259 TEH

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I.    INTRODUCTION

This estate tax case came before the Court on April 10, 2007, and April 12, 2007, for trial without a jury. Lois M. Stone ("Decedent") died on September 1, 1999. She was preceded in death by her husband, James Ralph Stone, who died on May 1, 1997. As Successor Trustees of the J. Ralph and Lois Stone Trust Agreement Dated January 5, 1990, and amended in its entirety on July 29, 1994, Plaintiffs Robert Grove Stone and Gary Ralph Stone own the property comprising Decedent's estate ("Estate").

Plaintiffs now claim a partial refund of estate taxes paid on the Estate's undivided 50% interest in nineteen paintings. Plaintiffs assert that the Internal Revenue Service ("IRS") incorrectly valued two of the nineteen paintings at issue and also improperly failed to allow a discount for the Estate's partial ownership of the collection. Plaintiffs contend that the IRS should not have valued the Estate's fractional interest at 50% of the full fair market value of the collection as a whole; instead, Plaintiffs argue that the Estate's interest should have been valued at 28% of the fair market value of the collection, which would reflect an additional 44% discount based on the fractional nature of the Estate's interest.[1]

---

[1] $(1 - 0.50) * (1 - 0.44) = 0.28$.

The parties presented opening statements and testimony from the following witnesses at trial: Edwin Anderson, the attorney who handled the estate tax filings for Plaintiffs' deceased parents; Robert Standish, a former estate tax attorney for the IRS who handled both of the Stones' estate tax filings; Carsten Hoffmann, managing director at FMV Opinions; Michael Findlay, an art dealer and member of the IRS art advisory panel; and Karen Carolan, the chair of the IRS art advisory panel.  Hoffmann, Findlay, and Carolan were qualified as experts with no objections from either party.  In lieu of closing arguments, the parties submitted simultaneous post-trial briefs and proposed findings of fact and conclusions of law on April 30, 2007, and simultaneous reply briefs on May 7, 2007.  Having carefully considered all of the evidence and testimony presented at trial, the parties' oral and written arguments, relevant law, and the entire record herein,[2] the Court now makes the following findings of fact and conclusions of law.

## II.   BACKGROUND

The parties do not dispute the factual and procedural background of this case. Decedent Lois Stone died on September 1, 1999.  On June 1, 2000, Plaintiffs timely requested an extension of time to file a return and pay estate taxes due on Decedent's Estate. At that time, Plaintiffs also paid estimated estate taxes of $12 million.  On November 10,

---

[2] At trial, the Court took under submission the admission of Plaintiffs' Exhibits 8, 14, 20, and 21, relating to the estate tax return of James Ralph Stone.  The Court now admits those exhibits but notes that it does not find them to be particularly relevant or persuasive. Had this been a jury trial, the Court may well have excluded these exhibits from evidence under Federal Rule of Evidence 403.
    In addition, the Court admitted a portion of *Art Law: The Guide for Collectors, Investors, Dealers, and Artists*, 3d ed., written by Ralph E. Lerner and Judith Bresler, as Plaintiffs' Exhibit 28.  The Court now strikes that exhibit from the record as hearsay. Although Plaintiffs did not make this argument, it appears that they were attempting to introduce Exhibit 28 as a learned treatise under Federal Rule of Evidence 803(18).  However, that rule specifically states that, "[i]f admitted, the statements may be read into evidence but may not be received as exhibits."  Fed. R. Evid. 803(18).  Here, Karen Carolan read portions of the exhibit into the record while being cross-examined by Plaintiffs' counsel.  Tr. at 256:8-257:3.  The Court does not find the commentary persuasive given that Lerner and Bresler state only that a taxpayer "should have a fair chance of convincing the IRS to allow some discount for the fractional interest," not that such a discount necessarily applies.  Pls.' Ex. 28 at 1578; *see also* Tr. at 257:1.  In fact, the authors state that "it is difficult to argue" that a discount should apply.  *Id.*; *see also* Tr. at 256:11-12.

2

1  2000, Plaintiffs filed a timely Form 706 estate tax return, in which Plaintiffs calculated the
2  total tax due on the Estate at $10,959,480.
3       On Schedule F of the Form 706, Plaintiffs valued the Estate's undivided 50% interest
4  in nineteen works of art at $1,420,000. Plaintiffs calculated this figure by taking 50% of the
5  total estimated value of the collection – $5,085,000, according to an appraisal by Sotheby's –
6  and then applying an additional 44% fractional interest discount and rounding to the nearest
7  ten thousand. Plaintiffs based their claimed fractional interest discount on an opinion
8  obtained from FMV Opinions, Inc.
9       On October 2, 2002, the IRS sent Plaintiffs an estate tax closing letter following its
10  audit of the Form 706 return. In that letter, the IRS concluded that the total estate tax
11  payable by the Estate was $11,832,056.49, rather than the $10,959,480 calculated by
12  Plaintiffs. Part of this difference – the only part at issue in this lawsuit – stemmed from the
13  IRS's determination that the Estate's undivided 50% interest in the art collection should be
14  valued at $2,766,250, or $1,346,250 more than the value claimed by Plaintiffs. This
15  difference in value resulted from both the IRS's determination that two paintings by Camille
16  Pissarro in the Estate's collection were undervalued by Plaintiffs and the IRS's determination
17  that no fractional interest discount should apply.[3]
18       Plaintiffs subsequently filed a timely Form 843 Claim for Refund with the IRS
19  seeking a refund of $525,037 plus accrued interest.[4] Plaintiffs contended that the IRS
20  improperly valued the two Pissarro paintings and also improperly failed to apply a fractional
21  interest discount. The IRS rejected Plaintiffs' claim in a letter dated July 21, 2005. On
22  January 13, 2006, Plaintiffs filed this lawsuit seeking a tax refund, repeating their contentions
23  regarding the two Pissarro paintings and the fractional interest discount.

---

[3] Additionally, the IRS determined that one painting attributed by Plaintiffs to Mary Cassatt was not genuine and, therefore, had a value of zero, rather than the $2500 claimed by Plaintiffs. Plaintiffs do not dispute this determination.

[4] The parties stipulated that Plaintiffs timely filed Form 843 on May 2, 2003. However, the actual form is dated April 28, 2003, and, in its letter denying Plaintiffs' claim for a refund, the IRS reported that the form was filed on May 8, 2003.

3

### III. JURISDICTION, VENUE, AND LEGAL STANDARD

The parties agree that Plaintiffs' suit was timely filed and that this Court has jurisdiction under 28 U.S.C. § 1346(a)(1). The parties further agree that Plaintiffs have complied with all statutory requirements for bringing this suit, *see, e.g.,* 26 U.S.C. §§ 6532(a)(1), 7422(a), 7422(f)(1), and that venue is proper in this Court pursuant to 28 U.S.C. § 1402 (a)(1). As parties seeking a tax refund, Plaintiffs "bear[] the burden of proving that the assessment was incorrect and proving the correct amount of the tax owed." *Ray v. United States*, 762 F.2d 1361, 1362 (9th Cir. 1985).

### IV.   VALUE OF THE TWO CONTESTED PISSARRO PAINTINGS

Before determining whether a fractional interest discount should be applied, this Court must first determine the full value of the entire collection of nineteen paintings. The parties agree on the value of seventeen of these paintings and disagree only on the value of two Pissarro paintings: *Soleil couchant, automne, Éragny*, and *La route d'Auvers, Pontoise*. Plaintiffs valued the *Éragny* painting at $800,000 and the *Pontoise* painting at $500,000, while the IRS valued the paintings at $1,000,000 and $750,000, respectively.

Upon consideration of the evidence presented, the Court adopts the IRS values. These values were arrived at by the IRS art advisory panel, a collection of experts convened periodically by the IRS to determine the fair market value of works of art valued at $20,000 or more for tax purposes. Panelists are not paid except for cost reimbursements, and panelists are not told whether an item is being valued for a charitable contribution deduction, estate tax valuation, or gift tax valuation. Nor are panelists told the identify of the taxpayer. The panel is comprised of experienced art experts, including art dealers, gallery owners, and museum curators. The Court finds the panel's valuations based on comparable sales of similar paintings near the date of valuation to be extremely credible, as well as unbiased.

Plaintiffs, by contrast, rely primarily on a Sotheby's appraisal that contains no description of how the valuations were determined. Plaintiffs also failed to introduce any expert testimony to support the Sotheby's valuations. The Court sustained the government's

4

1    objection to Plaintiffs' attempt to introduce the Sotheby's appraisal into evidence based on
2    lack of foundation, but even if the Court were to consider the appraisal, it would find it
3    unpersuasive. While Sotheby's is undoubtedly qualified to value art work, the lack of any
4    basis for its valuations in this particular case makes Plaintiffs' asserted valuations far less
5    persuasive than those of the IRS panel.

6    Plaintiffs additionally argue that the sale of the *Pontoise* painting for $464,000 –
7    approximately $300,000 less than the IRS's $750,000 valuation – in November 2005
8    demonstrates that Plaintiffs' own $500,000 valuation was more reasonable. Notably,
9    Plaintiffs do not seek to base the valuation of the *Éragny* painting – or any other painting in
10   the collection, for that matter – on the November 2005 sales data. This is likely because the
11   *Éragny* painting sold for $1.472 million – nearly $500,000 over the IRS's valuation as of
12   March 2000, and over $700,000 over Plaintiffs' own valuation. Plaintiffs cannot have it both
13   ways and seek to rely on 2005 sales data only when helpful to their position; the data is either
14   relevant to the entire collection or it is not. The Court finds that it is not because the
15   November 2005 sales data is too far removed in time to affect the paintings' values as of the
16   March 1, 2000 valuation date.[5] The government's experts credibly testified, for example,
17   that the *Pontoise* painting simply declined in value between 2000 and 2005.

18   Finally, Plaintiffs argue that the IRS previously accepted the Sotheby's valuations
19   during the processing of the estate tax return for James Ralph Stone, Decedent's husband.
20   However, Plaintiffs' counsel repeatedly stated that he was not arguing that the IRS was now
21   estopped from asserting that the paintings should have been valued differently for the Lois
22   Stone estate tax return. Moreover, Robert Standish, the IRS attorney who handled the estate
23   tax returns of both James Ralph and Lois Stone, credibly testified that: the IRS closed the
24   estate tax return of James Ralph Stone because the statute of limitations was expiring; the
25   government did not accept the Sotheby's appraisals; and the government's intent at the time
26   of closing out the James Ralph Stone estate tax file was to revisit both the value of the art

---

[5] Plaintiffs elected to use this alternate valuation date, rather than the actual date of Decedent's death, pursuant to 26 C.F.R. § 20.2032-1.

5

collection and the value of each estate's fractional interest in that collection when processing the Lois Stone estate tax return. The Court therefore concludes that the government's closing of the James Ralph Stone estate was not an admission by the IRS that the Sotheby's appraisal was correct or that a fractional interest discount should apply.

In light of all of the above, the Court rejects Plaintiffs' valuations of the two contested Pissarro paintings in favor of those presented by the IRS panel. The total fair market value of the nineteen paintings at issue in this case, as of the March 1, 2000 valuation date, is therefore $5,532,500 and not $5,085,000, as asserted by Plaintiffs.

## V.   PROPRIETY OF A FRACTIONAL INTEREST DISCOUNT

The Court now turns to the more difficult task of determining the fair market value of the Estate's undivided 50% interest in the nineteen works of art. The parties agree that this Court must apply the following regulation in doing so:

> The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate.

26 C.F.R. § 20.2031-1(b). This standard "'is objective, using a purely hypothetical willing buyer and willing seller. . . . The hypothetical persons are not specific individuals or entities.'" *Estate of Simplot v. Comm'r of Internal Revenue*, 249 F.3d 1191, 1194 (9th Cir. 2001) (quoting underlying tax court opinion that "accurately stated the law").

The government contends that, under this regulation, the fair market value of the Estate's undivided 50% interest equals 50% of the total fair market value of the nineteen paintings, or $2,766,250 ($5,532,500 x 0.50). Plaintiffs, on the other hand, assert that they are entitled to an additional 44% fractional interest discount off of this figure, resulting in a fair market value of $1,549,100 ($2,766,250 x (1 - 0.44)).

6

After carefully considering all of the evidence presented at trial, the Court concludes that a hypothetical seller who is under no compulsion to sell would not accept the 44% discount proposed by Plaintiffs. Both of the government's experts – Michael Findlay and Karen Carolan – testified that, while they were aware of sales of undivided interests in art occurring, none of these had ever occurred at a discount. Given Findlay's long history in buying, selling, and appraising art and Carolan's experience in working with art experts on art appraisals for more than thirty years, this is persuasive evidence that a hypothetical willing seller would not sell a fractional interest in art at a discount.[6]

Plaintiffs' expert, Carsten Hoffman, also testified that he could find no data regarding sales of undivided interests in art.[7] He therefore based his valuation of the Estate's interest in the collection in part on sales data for undivided interests in real estate and limited partnerships holding real property. As the government's experts persuasively testified, however, the art market differs from the real estate or business market. Art is simply not fungible. For instance, an investor in or collector of art may not prefer to own one painting of lesser value in its entirety rather than only a fractional interest of another painting of greater value if, for example, the aesthetics of the higher-valued painting were more appealing to the investor or collector. That is, while it can be said that it would be preferable to own 100% of painting X rather than 50% of painting X, it cannot be said that it would be preferable to own 100% of painting X rather than 50% of a higher-valued painting Y, despite the lack of control and, perhaps, marketability that would accompany shared ownership of Painting Y.[8] More importantly, although there is evidence that partial interests in real estate

---

[6] Findlay, currently the director of Acquavella Galleries in New York City, has over forty years of experience dealing with impressionist and twentieth-century art. Between 1984 and 2000, he worked in various positions at Christie's, including head of the auction house's impressionist and modern painting department and, subsequently, as worldwide head of painting sales. Carolan is currently the chief of the art appraisal services division of the IRS, where she has worked since 1974.

[7] Unlike the government's experts, Hoffmann has no experience in the art world; instead, his expertise is valuation of businesses.

[8] Marketability may only perhaps be a factor because, based on the testimony of the government's experts, shared ownership of art does occur, but typically only when there are written or unwritten agreements regarding subsequent disposition of the art.

7

1 have been sold at a discount, there is no evidence that similar sales have also occurred in the
2 art market.  Consequently, the Court rejects as unpersuasive the portions of Hoffmann's
3 report that are based on undivided real estate interest transactions and limited partnership
4 transactions.  Based on the evidence in this case, the Court instead concludes that a
5 hypothetical willing seller of an undivided fractional interest in art would likely seek to sell
6 the entire work of art and split the proceeds, rather than seeking to sell his or her fractional
7 interest at a discount.  At a minimum, because an undivided interest holder has the right to
8 partition, a hypothetical seller under no compulsion to sell would not accept any less for his
9 or her undivided interest than could be obtained by splitting proceeds in this manner.

10       This conclusion is not contrary to the authorities relied on by Plaintiffs.  The Court
11 does not, for example, violate the Supreme Court's holding that "the absence of market price
12 is no barrier to valuation," *Guggenheim v. Rasquin*, 312 U.S. 254, 258 (1941), because the
13 Court does not hold that the lack of a market for undivided interests in art means that such
14 interests either have no value or cannot be valued.  Plaintiffs' reliance on *Bank of California*
15 *v. Commissioner of Internal Revenue*, 133 F.2d 428 (9th Cir. 1943), and *Shackleford v.*
16 *United States*, 262 F.3d 1028 (9th Cir. 2001), is similarly misplaced.  In those cases, the
17 Ninth Circuit explained that courts must assume a willing buyer and willing seller, even if
18 none existed, and also assume that the property would change hands even though the
19 property in question in those cases could not, in fact, be sold.  *Bank of Cal.*, 133 F.2d at 433
20 (explaining that non-assignable property has a fair market value for estate tax purposes);
21 *Shackleford*, 262 F.3d at 1033 (holding that the district court properly assumed a hypothetical
22 market to value a non-assignable lottery prize for estate tax purposes).  Here, it is undisputed
23 that undivided interests in art are assignable and that, therefore, they may be sold.  The Court
24 finds, however, that the holder of such an interest who, as dictated by the governing
25 regulation, is under no compulsion to sell would either seek to sell the entire work of art –
26 with the consent of other co-owners or via an action to partition – and take his or her
27 appropriate share of the proceeds, or sell the partial interest at a price equivalent to his or her
28 fair share of the proceeds of such a sale.  The hypothetical willing seller would know that he

8

or she had the right to partition and would therefore not accept any less for his or her undivided interest than could be obtained via partition.

The question thus becomes whether Plaintiffs are entitled to a discount based on the costs to partition and sell the art collection. Plaintiffs' expert calculated the cost-to-partition discount to be 51%. Hoffmann Expert Report at 17-21 (Pls.' Ex. 3). To reach this figure, Hoffmann determined, based on the opinion of Plaintiffs' counsel, that a partition action would result in a court-ordered sale. Based on discussions with Plaintiffs, their counsel, and "representatives of fine art auctioneers" whose names Hoffmann could not recall at trial, Hoffmann estimated that it would take three years to complete this process. Hoffmann assumed that the art in the collection would increase in value at approximately 3% per year, which purportedly approximates the rate of inflation, and explained that the volatility of the art market would render any other appreciation rate arbitrary. To calculate the proceeds after a sale in three years, Hoffmann deducted commissions and sales fees, which he assumed to be 2% based again on discussions with unnamed "representatives of fine art auctioneers," from the projected value of the collection. He then allocated estimated legal fees of $50,000 and appraisal costs of $5,000 over the course of three years, before conducting a net-present-value ("NPV") analysis to conclude that the NPV of the Estate's 50% interest in the collection is approximately 51% less than half of the current market valuation of the collection as a whole. As part of his NPV analysis, Hoffmann determined that a 28% discount rate should apply to calculate the NPV of future cash flows. He calculated this figure by starting with 18%, based on a comparison with micro-cap companies (i.e., companies with equity capitalizations of approximately $252 million or less), and then adding 10% as a premium for lack of liquidity.

The government argues that case law supports its position that fractional discounts apply only to real property and not personal property. However, the government misrepresents the holding in *Estate of Pillsbury v. Commissioner of Internal Revenue*, 64 T.C.M. (CCH) 284 (1992). In that case, the tax court did not hold that fractional discounts can never apply to personal property; instead, it held that such a discount cannot be upheld

9

1 based on a "bare assertion that a discount is appropriate . . . *with no evidence to support it.*"
2 *Id.* at *6 (emphasis added). In addition, in *Propstra v. United States*, the Ninth Circuit stated
3 that "the holder of an undivided interest in property would have to secure the consent of the
4 owner or owners of the remaining interests before being able to sell as a unit. This factor
5 alone could affect valuation regardless of whether real *or personal property* is involved."
6 680 F.2d 1248, 1252 n.6 (9th Cir. 1982) (emphasis added).

       In fact, the government's own expert contradicts the government's assertion that no
8 discount is appropriate in this case. Carolan stated in her expert report that a 2% discount is
9 warranted to account for the estimated costs to sell the art at auction before the proceeds are
10 split among the interest holders. Carolan Expert Report at 23 (Def.'s Ex. 2). Similarly, she
11 testified at trial that it would be "logical" to "get the cost of the sale." Tr. at 223:5-6. In its
12 papers and during opening statements, the government completely ignored these statements
13 by its own expert despite Plaintiffs' raising the issue in both their pre- and post-trial papers.
14 The Court finds that a 2% discount for estimated costs of the sale is undisputed based on
15 Carolan's testimony, notwithstanding the government's repeated assertions that no discount
16 should apply.[9]

17        This Court also agrees with Plaintiffs that, contrary to the government's assertions, the
18 costs of a court-ordered partition must be considered in determining the fair market value of
19 the Estate's interest in the collection. Findlay testified that a sale would not occur without
20 the consent of all owners, and Carolan testified that it would be unnecessary to bring a legal
21 action to partition given the facts of this case since, for example, the nineteen paintings in the
22 collection could have been divided up so that each co-owner ended up with 100% ownership
23 in paintings valued at 50% of the total worth of the collection, or the co-owner wishing to

---

[9]Thus, the Court need not consider the government's argument that no discount should apply under Revenue Ruling 57-293, which indicates that a fractional interest discount is not appropriate when determining fair market value for charitable contributions on income tax returns. In any event, as Plaintiffs correctly observe, the revenue ruling cited by the government refers to income tax rather than estate tax valuations. Additionally, revenue rulings are only entitled to consideration and are not dispositive. *Ricards v. United States*, 683 F.2d 1219, 1224 & n.12 (9th Cir. 1981). For the reasons discussed in this opinion, this Court determines that a discount is appropriate in this case when Treasury Regulation § 20.2031-1(b) is properly applied.

10

sell could simply approach the other co-owner to get agreement to sell. However, this testimony by the government's experts fails to consider that one of the characteristics of an undivided interest is the right to partition, and that a willing seller therefore would not be powerless if his or her co-owners did not consent to the sale. In addition, the Court cannot assume that the Estate's co-owner in the collection would agree either to a sale of the collection as a whole or to a division of the nineteen paintings among the co-owners. Although in this case, the Estate's trustees actually owned the entire collection, the Ninth Circuit has made clear that this Court cannot consider that fact in determining the fair market value of the Estate's interest in the collection. The willing seller considered in determining fair market value must be "a hypothetical seller rather than the estate or any of decedent's beneficiaries." *Propstra*, 680 F.2d at 1251-52. The Court therefore cannot assume that the Estate would be able to obtain agreement from any other co-owners of the collection to sell the art as a whole or to divide the paintings in the collection. As the Ninth Circuit explained,

> The use of an objective standard avoids the uncertainties that would otherwise be inherent if valuation methods attempted to account for the likelihood that estates, legatees, or heirs would sell their interests together with others who hold undivided interests in the property. Executors will not have to make delicate inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in the property in question. Without an explicit directive from Congress we cannot require executors to make such inquiries.

*Id.* at 1252 (footnote omitted). Accordingly, the cost-to-partition discount must include some discount for fees associated with bringing a legal action to partition. In the absence of any contrary evidence, and because Plaintiffs' estimate is not unreasonable on its face, the Court accepts Plaintiffs' estimated $50,000 in legal fees.

However, the Court finds that appraisal costs need not be deducted when determining an appropriate cost-to-partition discount. The Court finds Carolan's testimony about the art auction process to be credible. Consequently, the Court concludes that an auction house would, more likely than not, waive the appraisal fees as part of its efforts to be selected to sell the pieces in the collection. Such fees could be and generally are recouped by charging a higher premium to buyers.

11

1   Even though the government presented no comparable cost-to-partition analysis to
2   Hoffmann's, the Court finds that the 51% cost-to-partition discount proposed by Hoffmann is
3   not persuasive.[10]  First, it is incongruous to assume that the art will appreciate by only 3% per
4   year while simultaneously assuming that the appropriate discount rate or expected rate of
5   return to calculate NPV is six times that amount, or 18%, even before adding a 10%
6   illiquidity premium.  Nor does the Court find persuasive Hoffmann's comparison of art to
7   micro-cap companies or stock offerings.  As with the real estate market, the market for these
8   commodities differs from the art market.  For example, Hoffmann's assumptions regarding
9   the volatility of the art market are persuasively rebutted by Carolan's testimony about the
10  nature of this particular collection, which includes works by "well known and frequently sold
11  artists" and not "unknown or untested artists," and that the collection is also not concentrated
12  in any particular artist or range of value.  Carolan Expert Report at 22.  Nonetheless, the
13  government's experts also testified that styles and types of paintings go in and out of fashion,
14  so it cannot be said that the art market has no degree of volatility, and the Court finds that
15  some discount is appropriate to allow for the uncertainties involved in waiting to sell the
16  collection until after a hypothetical partition action is resolved.  *Cf. Estate of Scull v. Comm'r*
17  *of Internal Revenue*, 67 T.C.M. (CCH) 2953 (1994) at *23 (finding appropriate a 5%
18  fractional interest discount "for any uncertainties involved in acquiring decedent's 65-percent
19  interest" based on ongoing litigation regarding decedent's interest).

20   In sum, the Court finds that a hypothetical willing seller who is under no compulsion
21  to sell would seek to gain consent from other co-owners to sell the collection and divide the
22  proceeds or, barring such consent, would bring a legal action to partition.  At the very least, a
23  hypothetical seller would consider the potential proceeds from the partition process before
24  agreeing to accept any fractional interest discount when selling his or her partial interest.
25  Because the Court cannot consider whether other co-owners would consent to a sale, a small

---

[10]Hoffmann himself recognizes the greater degree of subjectivity, and therefore diminished reliability, of the calculations used to perform his cost-of-partition analysis as compared to his use of empirical data in his other two methods of valuation.  Hoffmann Expert Report at 22.  However, as discussed above, the Court finds Hoffmann's other methods of valuation to be inapplicable to the art market.

12

1  discount is appropriate to account for legal fees required to enforce the hypothetical seller's
2  right to partition.  No discount is required to account for appraisal fees, but the government's
3  expert agrees that a 2% discount is appropriate to account for the actual costs of selling the
4  art by an auction house.  Finally, some discount is appropriate to account for the uncertainties
5  involved in waiting to sell the art until after the partition action is resolved.

6  Based on the evidence presented by the parties, it is difficult to discern precisely what
7  the appropriate discount for such uncertainties should be.  While this Court is capable of
8  determining a discount if necessary, it finds it preferable to allow the parties an opportunity
9  to further meet and confer on this issue now that the Court has resolved all of the parties'
10 other disputes.  When meeting and conferring on the appropriate discount, the parties shall
11 keep in mind that the Court rejects many of the assumptions underlying Plaintiffs' expert's
12 report, but it also finds that the government's experts have failed to address the valuation of
13 the Estate's undivided interest properly.

## VI. CONCLUSION

In accord with the above discussion, the parties shall meet and confer to attempt to settle this case now that the Court has resolved certain highly disputed issues.  If the parties would like the assistance of a magistrate judge in their settlement efforts, they shall telephone this Court's courtroom deputy.  If the parties can agree on a particular magistrate judge in San Francisco, the Court will refer the matter to that judge; otherwise, assignment will be made randomly.

If the parties are unable to reach agreement on the appropriate amount of Plaintiffs' tax refund, then this Court will decide on an appropriate discount that falls somewhere between the 2% discount proposed by the government and the 51% cost-to-partition discount proposed by Plaintiffs, based on the evidence presented at trial and keeping in mind that Plaintiffs bear the burden of proof.  The parties shall file a joint status statement regarding their settlement efforts on or before **Friday, June 22, 2007.**  They shall include in their joint statement a discussion of whether they have reached or anticipate being able to reach an

13

informal resolution and, if not, whether they have agreed or anticipate being able to agree on any sub-issues.

**IT IS SO ORDERED.**

Dated: 05/25/07

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT